**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

---

**MIKEY ENTERPRISES, INC.,**

      **Plaintiff,**

**v.**                                **No: _____**
                                                  **JURY DEMANDED**

**OWNERS INSURANCE COMPANY,**

      **Defendant.**

---

## COMPLAINT

---

COMES NOW the Plaintiff, Mikey Enterprises, Inc., by and through counsel, and submits the following for its Complaint against Owners Insurance Company:

## PARTIES AND JURISDICTION

1.  Mikey Enterprises, Inc. ("Plaintiff") is a Tennessee corporation with its principal office located in Gatlinburg, Tennessee. At times relevant hereto, Maury and Joan R. Greenstein ("Mr. and Mrs. Greenstein") owned the structures and improvements located at or around 239 Sycamore Lane, Gatlinburg, Tennessee (the "Insured Premises"). Mr. and Mrs. Greenstein sold the Insured Premises to Plaintiff in 2018 and assigned to Plaintiff the rights and benefits associated with the insurance claim that is the subject of this action.

2.  Owners Insurance Company ("Defendant") is an insurance company conducting business in the State of Tennessee, including Sevier County, Tennessee. Defendant's principal place of business is located in Lansing, Michigan.

3.     This Complaint originates as the result of the November 2016 wildfires and an associated windstorm that caused substantial insured losses to the structures located on the Insured Premises, and Defendant's failure and refusal to promptly and fully pay Plaintiff's insurance claim.

4.     Complete diversity of citizenship exists pursuant to 28 U.S.C. § 1332 and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.  Jurisdiction and venue are proper in this Court.

## FACTS

5.     At all times material hereto, Mr. and Mrs. Greenstein were insured policyholders pursuant to an insurance contract whereby Defendant agreed to insure the structures and improvements located on the Insured Premises against property damage, bearing Policy No. 134619-03654219-16 (the "Policy").  As relevant hereto, the Policy's term was November 8, 2016 through November 8, 2017.  The Policy is incorporated by reference as if set forth verbatim herein, and is attached hereto as **Exhibit A**.

6.     At all times relevant hereto, the Insured Premises consisted of a commercial building and surrounding area, which was operated as an Inn.

7.     The Policy provided insurance coverage for direct physical loss to the building located on the Insured Premises and such other insurance coverage as specifically set forth in the Policy.

8.     The Declarations page of the Policy reveals that the structure limit on the building was $1,055,900.

9.     The Policy was an "all-risks" policy, meaning that the Policy covered all risks of direct physical loss or damage except for those specifically excluded or limited by the Policy.

2

10. The Policy's coverage for the building and structures on the Insured Premises was on an actual cash value basis, calculating by subtracting depreciation from the replacement cost of the necessary repairs.

11. Pursuant to the Policy, an annual premium was paid to Defendant in exchange for the insurance coverage. The required premiums were paid at all times relevant to this Complaint. Coverage for the Insured Premises was in place on the date of the subject loss pursuant to the terms of the Policy.

12. In late November 2016, the building on the Insured Premises was infested and damaged by the accumulation of soot, ash residue, and other wildfire debris generated as a result of the Chimney Tops 2 wildfire that struck the area, resulting in substantial direct, physical loss. The roofs of the building also suffered damage caused by wind during the windstorm that accelerated the wildfires. The direct physical loss and damage to the building at the Insured Premises shall hereafter be referred to as the "Loss."

13. The Chimney Tops 2 wildfire started in the Chimney Tops area of the Great Smoky Mountains National Park, approximately 5.5 miles south of the City of Gatlinburg on November 23, 2016. A high wind-driven firestorm on November 28, 2016 and into November 29, 2016 pushed the wildfire, smoke, and embers into Gatlinburg and led to evacuation of most city residences and visitors, impacting over 2,500 structures, and resulting in three deaths in the city and eleven more in Sevier County. The evacuation order was lifted on December 9, 2016.

14. Conditions at the Insured Premises at the time of the firestorm included thick smoke, with extremely low visibility, twilight illumination, falling ash resembling snow, high winds (over seventy miles per hour), and flying debris. The interior of the Insured Premises was

smoky with fire debris in the air. Air quality remained hazy and poor for several days after the firestorm.

15.     As part of Plaintiff's purchase of the Insured Premises in the fall of 2018, Plaintiff discovered the damage caused by the Loss during its due diligence. On or around September 14, 2018, Mr. and Mrs. Greenstein assigned its insurance claim against Defendant to Plaintiff, via a document titled Assignment of Claim and Benefits (the "Assignment") (attached hereto as **Exhibit B**).

16.     Plaintiff notified Owners of the Loss to the Insured Premises.

17.     Plaintiff fulfilled all of the duties after the Loss that were imposed upon it by the Policy to the satisfaction of Defendant.

18.     As it relates to the Loss, there is no applicable exclusion. The Loss is a compensable claim under the Policy.

19.     On November 21, 2018, Plaintiff and Defendant entered into a Tolling Agreement (attached as **Exhibit C**). The Tolling Agreement states

> The period between the Effective Date of this Agreement and the Termination Date (as defined below0 of this Agreement shall not be included in determining the applicability of any defense based on a statute of limitations, any contractual limitations periods, and limitation(s) periods in the Policy (including, without limitation, any term in the Policy that requires a legal action to be brought against Owners within a certain period of time after the date on which the loss occurred), laches, or any defense based on the lapse of time, in any suite or other dispute resolution proceeding brought by Mikey [Enterprises, Inc.] or such other persons or entities that may be insureds in the Policy or assignees of the Insurance Claim. The Parties understand and agree that this Agreement shall operate to toll any and all limitations periods relating in any way to the Insurance Claim only between the Effective Date through and including the date on which this Agreement is terminated pursuant to Paragraph 3 of this Agreement (the "Termination Date"). Further the tolling of any time-related defenses shall also extend three (3) business days following the Termination Date to allow for the filing of suit if no

4

resolution of the matter is reached during the term of this Agreement.

20.     The Termination Date for the Tolling Agreement was February 18, 2019.

21.     On February 8, 2019, Plaintiff and Defendant entered into an Addendum to Tolling Agreement (attached as **Exhibit D**) that extended the Termination Date from February 18, 2019 up to and including May 31, 2019.

22.     As part of the determination of the amount of the loss, Forensic Building Science ("FBS") inspected the Insured Premises and conducted soot and char sampling to be sent to a qualified laboratory for testing.  The sampling and testing revealed that smoke soot and char, consistent with wildfire, was present in the building.  Based on the sampling, FBS determined a protocol for repairs, which Plaintiff's appraiser utilized to determine the amount of the loss.

23.     The FBS reports and associated lab testing confirmed the presence of wildfire residue in the form of char, ash, and other wildfire indicators.

24.     On December 31, 2018, Plaintiff provided Defendant with an estimate of loss prepared by its appraiser, Chuck Howarth, along with satellite imagery showing the roof of the Insured Premises before and after the Loss.  Plaintiff also provided the report and photos from FBS to Defendant, which included test results from samples taken from the Insured Premises that showed the presence of wildlife debris from the Loss.

25.     On January 15, 2019, Defendant requested that a Sworn Statement in Proof of Loss, along with other documentation related to the claim be provided by Plaintiff.  On February 5, 2019, the executed Sworn Statement in Proof of Loss was provided to Defendant, which made claim in the amount of $873,912.58.  The additional documents requested by Defendant were also provided to Defendant's satisfaction.

5

26.    Thereafter, Defendant sent Armour Applied Science, LLC ("Armour"), Rimkus Consulting Group, Inc. ("Rimkus"), and Americlaim of East Tennessee ("Americlaim") to the Insured Premises.

27.    On or around February 6-7, 2019, Armour took samples from the Insured Premises for testing.

28.    Rimkus found wind damage to the Insured Premises caused by the Loss, as well as interior water damage.

29.    Purportedly based on reports from Rimkus and Armour, Americlaim prepared an estimate. The Americlaim estimate included no amounts associated with remediating the insured building's exposure to wildfire debris, but rather only included amounts associated with wind damage to the roof and corresponding water intrusion. This estimate provided a replacement cost value ("RCV") of $21,234.04 for the repairs with an actual cash value ("ACV") of $12,355.01, which is RCV less depreciation.

30.    The Policy does not define ACV.

31.    Defendant calculated its ACV payment obligation to Plaintiff by first estimating the cost to repair or replace the damage with new materials (RCV) and then subtracting depreciation to arrive at ACV.

32.    In adjusting Plaintiff's claim, Defendant affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the Loss and make its ACV payment to Plaintiff.

33.    Defendant has waived and is estopped from asserting any right to contend that the ACV should have been calculated under any methodology other than the methodology actually used by Defendant.

34. Defendant used commercially available computer software to make its RCV depreciation, and ACV calculations.

35. Plaintiff was underpaid pursuant to the Policy, as more fully described herein.

36. Defendant has acknowledged that the Loss is a compensable claim and made a payment of $2,335.01 ($12,335.01 less the Policy's $10,000 deductible), but refused to make any additional payments, as set forth in Defendant's May 8, 2019 correspondence (attached as **Exhibit E**).

37. In further support of its claim, Plaintiff retained Enrique Medina, MS, CIH, CSP, FAIHA, with Alliance Consulting International, to inspect the Insured Premises to determine whether wildfire residue was present and, if needed, to prepare a restoration protocol. Mr. Enrique's specialty is wildfires, and in early 2018 he served as editor and author of the "Technical Guide for Wildfire Impact Assessments for the OEHS Professional," which was published by the American Industrial Hygiene Association.

38. Mr. Medina took sixteen samples from the Insured Premises, and upon laboratory analysis, the presence of wildfire residue in the form of char, ash, and other wildfire indicators were conclusively confirmed.

39. On May 5, 2019, Plaintiff provided Defendant with Mr. Medina's report, titled *Wildfire Residue Impact Assessment*. Mr. Medina concluded that 12 out of 15 samples "conclusively confirm the presence of wildfire residue in the form of char and wildland fire indicators." "Settled wildfire residue that has not been cleaned has the potential to aerosolize and disperse into the occupied space through air pathways subject to mechanical and environmental forces and to continue to emit and carry odors and affect indoor air quality." Mr. Medina also made recommendations for restoration, including the removal of the wildfire residue from the

structures pursuant to industry standard restoration protocols, such as cleaning, sealing, painting, and/or replacing, and post-restoration testing, as necessary.

40.     Despite the fact that Plaintiff has fulfilled all duties imposed upon it by Defendant and is at no fault in this matter, Defendant has wrongfully refused to fully and promptly pay Plaintiff's claim for insurance proceeds.

41.     The payment made by Defendant to Plaintiff is insufficient to indemnify Plaintiff for the Loss pursuant to the Policy.

42.     On May 20, 2019, Plaintiff invoked the Policy's appraisal clause.

43.     The Policy's appraisal clause provides as follows:

**<u>Appraisal</u>**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

    a.     Pay it chosen appraiser; and
    b.     Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we still retain our right to deny the claim.

44.     Plaintiff selected Chuck Howarth, President of The Howarth Group, as its appraiser. Defendant has not indicated whether or not it will agree to participate in the appraisal process, and has declined to extend the tolling agreement, thus necessitating the filing of this lawsuit.

45.     Wildfire residue exists in the building at the Insured Premises that was not present prior to the November 2016 wildfire.

46. As noted in Mr. Medina's report, the wildfire residue caused by the Loss must be removed from the Insured Premises.

47. Additionally, when calculating its actual cash value payment obligations to Plaintiff, Defendant depreciated labor in violation of Tennessee law. In this pleading, whenever reference is made to depreciating "labor," "labor" means intangible non-materials, specifically including both the labor costs and the laborers' equipment costs necessary to restore Plaintiff's property to its condition immediately prior to the loss, as well as "removal" costs to remove damaged property, under the software program described below.

48. The ACV payment Defendant made to Plaintiff depreciated the cost of both materials and labor required to repair or replace Plaintiff's property, even though labor does not depreciate in value over time. Defendant depreciated costs associated with labor throughout its ACV calculations. Defendant also depreciated labor costs for other work necessary to repair and replace Plaintiff's property.

49. Defendant's depreciation of labor costs associated with the repair or replacement of Plaintiff's property resulted in Plaintiff receiving payment for the Loss in an amount less than Plaintiff was entitled to receive under the Policy. Defendant breached its obligations under the Policy by improperly depreciating the cost of labor.

50. Plaintiff cannot determine the precise amount of labor that has been depreciated based upon the written estimate provided.

51. Plaintiff concedes that finished goods and construction materials can diminish in value over time due to use, wear, obsolescence, and age. Therefore, finished goods and construction materials depreciate. In contrast, both removal labor and installation labor are not susceptible to aging or wear. Their value does not diminish over time. Conceptually, practically,

and under common understanding, depreciation cannot be applied to labor to remove damaged property or repair damaged property in the context of indemnification insurance.

52.     Labor, by its nature, does not depreciate, and an insurer therefore may not depreciate labor.  For example, materials used in the repair or replacement of a roof (roofing shingles) diminish in value over time due to the wear that age and use inflict on them.  In contrast, labor is not susceptible to aging or wear, it does not lose value over time, and there is no depreciable life of labor. Labor's value does not diminish over time; only the materials depreciate.

53.     Defendant's practice of depreciating labor costs is inconsistent with the universally accepted premise that the fundamental purpose of property insurance is to provide indemnity to policyholders. To indemnify means to put the insured back in the position he or she enjoyed before the loss—no better and no worse. A policy, like Defendant's policy, that provides for payment of the ACV of a covered loss is an indemnity contract because the purpose of an ACV payment is to make the insured whole after the loss that occurred.

54.     While an insurer may lawfully depreciate material costs when calculating the amount of an ACV payment owed to an insured, it may not lawfully depreciate repair labor. Defendant's failure to pay the full cost of the labor necessary to return Plaintiff back to her pre-loss condition left Plaintiff under-indemnified and underpaid for the Loss.

55.     Defendant materially breached its duty to indemnify Plaintiff by depreciating labor costs associated with repairing or replacing Plaintiff's property in its ACV payment, thereby paying Plaintiff less than it was entitled to receive under the terms of the Policy.

56.     At all times relevant hereto, Defendant was under an affirmative duty to disclose the manner in which it calculates ACV payments to policyholders.

57.     In addition, when providing estimates to Plaintiff, Defendant was under a duty to be truthful.

58.     To conceal its practice of depreciating labor from policyholders, Defendant did not separate the amounts it depreciated for labor charges from amounts it depreciated for materials in the estimates provided to insureds with their ACV payments.

59.     The commercial estimating software used by Defendant easily permits further separation of the line item charges so policyholders can determine whether labor was being depreciated.  Defendant did its best to make it impossible for an ordinary consumer to know that Defendant depreciated labor, and not merely materials, when reviewing estimates provided to policyholders.

60.     To further conceal its practice of depreciating labor in the estimates, for some line items that only contain obvious labor costs standing alone, such as charges for hauling debris, Defendant did not depreciate labor —all to help avoid detection of its depreciation of labor in other line items.

61.     Defendant was in a superior position over policyholders to know that it was depreciating labor through its estimating software. Defendant controlled the settings for the software, which expressly permit an adjuster to properly limit depreciation to materials only.

62.     Defendant fraudulently concealed its breaches of contract from Plaintiff.

63.     The facts misrepresented, concealed, or otherwise not disclosed to Plaintiff were material facts that a reasonable person would have considered important.

64.     The concealment of information in estimates was performed by Defendant with the intent that policyholders, including Plaintiff, believe that only materials were being depreciated.

65.     More recently, on April 15, 2019 (before Defendant made its ACV payment to Plaintiff), the Tennessee Supreme Court ruled that depreciation of labor under a policy of insurance with substantially the same language as exists in the case at bar was wrongful.  *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 2019 Tenn. LEXIS 169 (Tenn. 2019).  As the Lammert case involved a sister company of Defendant, Defendant was acutely aware of the *Lammert* decision at the time that it issued payment to Plaintiff in the instant case, intentionally, fraudulently, willfully, and recklessly continuing its violation of Tennessee law.

66.     Defendant's decision to deny further payment is unconscionable.

67.     Plaintiff has not been properly compensated for the damage to its building.

68.     Defendant refuses to make full payment to Plaintiff for its covered loss.

69.     Defendant's failure and refusal to pay Plaintiff the amounts owed to it for the Loss is without justification, and was intentional, fraudulent, malicious and/or reckless.

70.     Defendant's failure and refusal to pay the money and benefits due and owing Plaintiff under the Policy has caused Plaintiff to initiate this Complaint to recover the insurance proceeds to which it is entitled.

## CAUSES OF ACTION

### Count 1 – Breach of Contract

71.     The allegations contained in the paragraphs above in this Complaint are incorporated herein by reference as if set forth verbatim.

72.     The Policy issued by Defendant is a binding contract and is supported by valid consideration.

73.     Defendant is in total material breach of the Policy, and Defendant is liable to Plaintiff in the maximum amount allowed by the Policy for the Loss.  Specifically, Defendant's

breach of contract includes the following, without limitation: (a) Defendant's failure and refusal to pay the amounts owed to Plaintiff for the Loss under the Policy; and (b) Defendant's failure and refusal to pay such other amounts to Plaintiff as may be required by the Policy; and (c) Defendant's refusal to honor Plaintiff's demand for appraisal as outlined in the Policy.

74.     As a result of Defendant's breach of contract, Plaintiff has sustained substantial compensable losses for the amounts claimed under the Policy.

75.     Defendant is liable to Plaintiff for its losses.

76.     Defendant's breach of contract was intentional, fraudulent, malicious, and/or reckless, therefore justifying an award of punitive damages. *See, e.g., Riad v. Erie Ins. Exchange*, 436 S.W.3d 256, 276 (Tenn. Ct. App. Oct. 31, 2013). Specifically, Defendant intentionally, fraudulently, maliciously, and/or recklessly: (1) failed to effectuate a prompt and fair settlement of Plaintiff's claim when liability was reasonably clear; (2) refused and failed to conduct a reasonable, prompt, and fair investigation concerning the issues surrounding Plaintiff's claim for insurance proceeds; (3) unjustly refused and/or failed to pay Plaintiff's claim for its own financial preservation with no reasonable or justifiable basis; (4) refused payment on Plaintiff's claim for no valid reason whatsoever; (5) failed to treat Plaintiff's interests with equal regard to its own; (6) failed to provide prompt and accurate communication and status reports; (7) failed and refused to pay for obvious damage caused by the Loss; (8) failed to timely investigate, scope, and estimate the Loss; (9) knew the true facts that the building was damaged by the Loss beyond the repairs set forth in the Rimkus Report and Americlaim Estimate, but falsely represented to Plaintiff that this was the only amount owed under the Policy for the Loss; (10) failed to promptly respond to Plaintiff's request to exercise its contractual right to appraisal to resolve its dispute with Defendant concerning the amount of the loss; (11) concealed important and material facts from Plaintiff in an

effort to minimize the amount Defendant would have to pay on the claim; (12) misrepresented relevant facts and policy provisions to Plaintiff; (13) failed to adopt and implement reasonable standards for the prompt investigation and settlement of claims; (14) forced Plaintiff to file suit to enforce its rights under the Policy; (15) failed to make a full ACV payment to Plaintiff despite knowing that the depreciation of labor was not allowed in the State of Tennessee under the Policy and with no honest disagreement or innocent mistake concerning the validity of the nature and amount of Plaintiff's claim; and (16) such other facts and circumstances as alleged in this lawsuit and/or to be determined during discovery and which will be shown at trial. Defendant knew, or reasonably should have known, that Plaintiff was justifiably relying on the money and benefits due it under the terms of the Policy. Nevertheless, acting with conscious disregard for Plaintiff's rights and with the intention of causing or willfully disregarding the probability of causing unjust and cruel hardship on Plaintiff, Defendant consciously ignored Plaintiff's valid claim and then denied Plaintiff's claim and withheld monies and benefits rightfully due Plaintiff.

77.    Plaintiff seeks, and is entitled to, punitive damages.

WHEREFORE, as a result of the foregoing, Plaintiff would respectfully request that this Honorable Court award a judgment to Plaintiff as follows:

A.    For compensatory damages to Plaintiff against Defendant not to exceed $1,100,000.00;

B.    For punitive damages against Defendant in an amount to be determined by the jury but not to exceed nine times the amount of compensatory damages awarded to Plaintiff or such other amount as allowed by law;

C.    For specific performance of the Policy's appraisal clause;

D.    For all costs incurred by Plaintiff as a result of this action;

E.     For pre- and post-judgment interest; and

F.     For such other further and general relief as this Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a jury.

Respectfully submitted,

GILBERT McWHERTER
SCOTT & BOBBITT PLC


/s/ J. Brandon McWherter
J. BRANDON McWHERTER #21600
bmcwherter@gilbertfirm.com
JONATHAN L. BOBBITT #23515
jbobbitt@gilbertfirm.com
341 Cool Springs Blvd, Suite 230
Franklin, TN  37067
Telephone: (615) 354-1144

CLINTON H. SCOTT #23008
cscott@gilbertfirm.com
101 North Highland
Jackson, Tennessee 38301
Telephone: (731) 664-1340

*Attorneys for Plaintiff*